**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **JEFFREY A. EVANS,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **Case No. CIV 10-139-RAW-KEW** |
| | ) | |
| **JUSTIN JONES, DOC Director,** | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Magistrate Judge on petitioner's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Petitioner, an inmate currently incarcerated at Lawton Correctional Facility in Lawton, Oklahoma, attacks his conviction in Love County District Court Case No. CF-2006-75 for Murder in the First Degree. He sets forth the following grounds for relief:

I.  Irrelevant and inconsistent instructions, coupled with the prosecutor's misleading argument, erroneously conveyed to the jury that petitioner was not legally entitled to act in self-defense.

II.  Trial court erred in failing to instruct the jury that the external circumstances surrounding the commission of a homicidal act may be considered in determining the defendant's mental state.

III.  Petitioner was deprived of his due process rights when the trial court refused to give his requested instruction on manslaughter while resisting criminal attempt.

IV.  Petitioner was denied due process by trial court error of issuing instruction that the defendant had been impeached, absent evidence supporting it.

V.  Petitioner was denied due process by trial court error in admitting, over petitioner's objection, his booking photograph, due to unfair prejudicial effect and lack of relevance.

VI.  Petitioner was denied due process by injection of rumor in plain violation of rules against admission of hearsay, where prejudice occurred.

VII.  Petitioner was denied the effective assistance of trial counsel.

VIII. Petitioner was denied due process and a fair trial by the cumulative effect of errors raised on direct appeal.

IX. Petitioner was denied a fair trial due to prosecutorial misconduct, where on cross-examination the prosecutor caused petitioner to demonstrate how he had used the gun to kill the victim.

X. Petitioner was denied a fair trial when trial court failed to adequately investigate petitioner's competency to testify, after becoming aware that petitioner was taking narcotics.

XI. Prosecutor's discovery violation deprived petitioner of evidence material to issue of guilt/punishment, casting entire case in different light, where prosecutor failed to provide copy of email instruction to forensics experts not to conduct fingerprint analysis on gun.

XII. Petitioner was denied due process of law, where state agents acting in bad faith deliberately failed to conduct fingerprint analysis on gun.

XIII. Petitioner was denied due process when investigator for medical examiner's office testified outside his personal knowledge regarding autopsy performed outside his presence by another.

XIV. Petitioner was denied due process when investigator for medical examiner's office testified outside his area of expertise regarding distance of gun from victim/soot/stippling.

XV. Petitioner was denied a fair trial and due process by numerous instances of prosecutorial misconduct.

XVI. Petitioner was denied effective assistance of trial counsel through numerous errors of counsel.

XVII. Petitioner was denied a fair trial and due process by prosecutorial misconduct, where on cross-examination prosecutor caused petitioner to identify five gunshot wounds on photograph of victim.

XVIII. Petitioner was denied a fair trial and due process by trial court's refusal to issue jury instructions for defense of another and resisting criminal attempt.

XIX. Petitioner was denied a fair trial and due process by inadequate protections of Oklahoma's jury notebooks procedure.

XX. Prosecutor's questions on cross-examination improperly encroached on petitioner's Fifth Amendment right to remain silent, where there were inappropriate comments on petitioner's decision not to make a statement upon arrest.

XXI. Petitioner was denied effective assistance of appellate counsel, where counsel failed to raise meritorious claims [later] presented on post-conviction.

The respondent concedes that petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review and has submitted the following records to the court for consideration in this matter:

A.    Petitioner's direct appeal brief.

B.    The State's brief in petitioner's direct appeal.

C.    Summary Opinion affirming petitioner's judgment and sentence. *Evans v. State*, No. F-2007-424 (Okla. Crim. App. Oct. 16, 2008).

D.    Petitioner's application for post-conviction relief.

E.    Order denying petitioner's application for post-conviction relief. *State v. Evans*, No. CF-2006-75 (Love County Dist. Ct. Oct. 16, 2009).

F.    Petitioner's brief in his post-conviction appeal.

G.    Order Affirming Denial of Post-Conviction Relief. *Evans v. State*, No. PC 2009-995 (Okla. Crim. App. Mar. 5, 2010).

H.    Transcript of petitioner's jury trial.

I.    Jury Instructions.

J.    Petitioner's booking photograph (State's Exhibit 20).

K.    Original Record.

## Facts

Petitioner was convicted of the May 22, 2006, murder of Calvin Porter. Daniel Howard testified that on Friday, May 19, 2006, he had a conversation with Porter in which Porter said he had sold methamphetamine to someone who never paid him for it, so Porter later sold the man rock salt for $100. (Tr. 122-23, 130). The next day Howard told petitioner about Porter's substituting rock salt for methamphetamine, and petitioner said that back in the old days, you could get killed for doing that, and he would kill anyone who did it to him. (Tr. 125-26, 130).

On Monday, May 22, 2006, at approximately 8:00 a.m., Howard was at home in his pickup, preparing to go to work, when petitioner drove by and stopped. (Tr. 127). Petitioner told Howard to go ahead of him, because petitioner was going into town to get money to buy some "shit," which Howard said meant methamphetamine. (Tr. 127-28). Howard warned petitioner not to buy drugs there, because they would sell him rock salt. (Tr. 128). Petitioner said he would kill anyone who did that to him. (Tr. 128).

Elizabeth Burton testified that on May 22, 2006, at approximately 5:30 or 6:00 p.m., she was driving north in her red truck with her child as a passenger. (Tr. 136, 144). She noticed a yellow truck in the center of the road, coming toward her. (Tr. 136). The yellow truck was blocking her way, and the other driver put out his hand for her to stop. (Tr. 136-37, 153). She stopped and petitioner, who had been driving the yellow truck, got out of his vehicle and came to her window. (Tr. 137). He asked her if anybody was at Tuck's Ferry. (Tr. 137). She was confused about the question, and told him she did not think anyone was there. (Tr. 138). It was not unusual, however, for people to stop and talk, so at that point she did not think the situation was odd. (Tr. 150).

Petitioner pointed to his passenger in the yellow truck and said he was going to take him there. (Tr. 138-39). The passenger was just sitting in petitioner's truck, and Ms. Burton did not know what to do. (Tr. 139). Petitioner then walked back to his truck where the driver's door was open. (Tr. 139). He stood behind the open driver's door and pulled something from the back of his shirt, holding it down as he and the passenger talked. (Tr. 139-40). She could not see the object, because petitioner's truck door blocked her view, and she thought he was putting it in the back seat of the truck. (Tr. 140, 146-47). The two men were talking, and the passenger was shaking his head as petitioner stood outside his pickup, but Ms. Burton could not tell what they were saying or whether they were arguing. (Tr. 140, 147). The passenger shook his head from side to side, as if he were saying "No, no, no." (Tr. 147). Both petitioner and the passenger had their hands down. (Tr. 147).

Ms. Burton backed her truck up a little distance and went around petitioner's truck on

the passenger's side. (Tr. 140-41). She had to drive in the grass to get past his truck and back on the road. (Tr. 141-42). She was driving slowly, because she did not know what was going on, but she knew she did not want to stay there. (Tr. 142). She did not look at the men when her truck was even with petitioner's truck. (Tr. 148). Her window was rolled down, and she was looking in her side mirror. (Tr. 142, 151). When she got back on the road, she saw and heard petitioner raise his arm and shoot the passenger three times in the head. (Tr. 142-43). She did not see any scuffle between the two men. (Tr. 142-43). Instead, the passenger was seated, petitioner was standing, and they were looking at each other. (Tr. 143). After the three shots were fired, the passenger's head dropped. (Tr. 143-44).

Ms. Burton testified she "freaked out" and did not know what to do, so she drove off quickly. (Tr. 144). She could not get a signal on her cell phone, so she drove down the road to a phone where she could call 911. (Tr. 144-45). She described the yellow truck to the dispatcher and advised they were headed to Tuck's Ferry. (Tr. 145).

John Miller, an investigator for the State of Oklahoma Medical Examiner's Office, testified that on May 22, 2006, he was called to investigate the site where Calvin Porter's body was found in the middle of a gravel cul-de-sac. (Tr. 154-56, 174). It appeared that Porter had projectile injuries and had been run over by a vehicle as the vehicle left the area. (Tr. 157). Tire marks were on Porter's left hand and left leg, going into the right leg. (Tr. 157). The body was sent to Oklahoma City for an autopsy where two bullets were removed. (Tr. 158-59). Porter had entrance gunshot wounds above his left ear, above his left cheek, into his left shoulder, and passing into the chest cavity. (Tr. 160-61). Entrance and exit wounds were on the right hand. (Tr. 161, 171). There also was a graze wound consistent with a gunshot. (Tr. 160-61).

Jerry Putman testified he had known petitioner for about 30 years, and they were good friends. (Tr. 178). Petitioner had been staying at Putman's house for a while, because petitioner's house was without electricity. (Tr. 178). At about 5:00 p.m. on May 22, Putman was in the bathroom when he heard a pickup arrive. (Tr. 180). He then heard petitioner tell

Putman's girlfriend Tina Wallace, "Here's some beer. Put it in the ice box and I'll be back in a little while." (Tr. 180-81). When Putman came out of his house, he saw the burn barrel in his yard was smoldering, and his garden hose had been moved and had a small amount of water running out of it. (Tr. 181-82, 192).

Oklahoma State Bureau of Investigation (OSBI) Agent David Houston testified he worked the crime scene. (Tr. 216). Pursuant to a search warrant, he searched petitioner's pickup which had bloodstains on the inside of the windshield. (Tr. 219-20). An unloaded .38 caliber Special was found under the driver's seat, and numerous bloodstains were inside the truck. (Tr. 221-25).

Roger Marrs, an OSBI criminalist, testified that the OSBI firearms expert determined the two recovered bullets were fired from the pistol found in petitioner's truck. (Tr. 239, 251-52). In addition, DNA analysis found the blood samples from the windshield and the truck interior matched the victim's blood. (Tr. 252-54).

Jesse Evans, petitioner's sister-in-law, testified that petitioner was not a violent person and was a friend to everybody he met. (Tr. 256-58). When she got home from work on May 22, 2006, her husband's yellow truck was gone, and petitioner's truck was parked in its place. (Tr. 259). While she was talking on the phone to her husband about the trucks, petitioner pulled up in the yellow truck and got into his own truck with a man she did not know, and the two of them left. (Tr. 259). They returned in a couple of minutes, and she found out that the other man was Calvin Porter. (Tr. 259). Ms. Evans, petitioner, and Mr. Porter went in the house, where she listened to music and they played the guitar. (Tr. 260). Porter had a "white power" tattoo on his chest, and he could not sit still. (Tr. 260-62). She was very uncomfortable having him in her home. (Tr. 262-63).

Petitioner's brother Jimmy Lee Evans, Jr., testified that petitioner was basically a good guy who did not get into fights. (Tr. 276-77). Petitioner had been injured by falling off a cliff years earlier and was "almost disabled." (Tr. 277-78). When Jimmy Evans returned home on May 22, he found petitioner and Calvin Porter in his house. (Tr. 279-80). Porter

appeared to be on some type of drugs and was acting fidgety. (Tr. 279). Porter used the telephone without permission and acted as though he were in his own house. (Tr. 280). After Jimmy Evans got Porter to go outside the house, Porter said something to petitioner like, "[Y]ou're lucky I didn't ball you up earlier." (Tr. 280-81). Petitioner just smiled as though Porter was only kidding. (Tr. 281). Petitioner and Porter then left in the yellow truck. (Tr. 281). On cross-examination Jimmy Evans, Jr., testified he had given a statement that petitioner drank beer every day and occasionally smoked marijuana. (Tr. 282, 287-88).

Petitioner testified he had known Calvin Porter for three days before May 22, 2006. (Tr. 327). The basis of their relationship was drinking beer and playing guitars at Jerry Putman's house. (Tr. 326-28). Porter had just been released from prison. (Tr. 327). After petitioner met Porter, Putman's girlfriend Tina told petitioner that Porter was selling fake methamphetamine. (Tr. 328). Petitioner testified he was not using methamphetamine. (Tr. 329-30).

Petitioner slept at Putman's house the night of May 21, 2006, and when he woke up the morning of May 22, he got in his truck and left to get it fixed. (Tr. 330). He saw Daniel Howard getting ready to leave and told Howard to go ahead of him, because petitioner could not drive his truck fast. (Tr. 330). Petitioner recalled a conversation with Howard about somebody selling methamphetamine and admitted that he might have told Howard something about if "somebody does that to me, I'll kill them." (Tr. 330).

Petitioner then went to his house in town and was putting up some scaffolding in the yard when Porter, Putman, and Ms. Wallace drove up. (Tr. 331). They had come to drop off Porter, so petitioner and Porter could tow Porter's van from town to the valley. (Tr. 331). Petitioner needed money to buy a tool to fix his pickup, so Ms. Wallace took him to his mother's house to get twenty dollars. (Tr. 331-32). Porter and Putman stayed at petitioner's house, while petitioner and Wallace were gone. (Tr. 332). Petitioner told Porter and Putman they could look through his antiques and old magazines while he was gone. (Tr. 333).

Petitioner testified he had a gun that had been left at his house by an old friend, and

it was the gun found in his truck. (Tr. 333-34). Only Tina Wallace knew that he usually kept the gun behind a piano in his house. (Tr. 334). When petitioner and Wallace returned, Porter and Putman were on the front porch looking through boxes of old stuff. (Tr. 335). Petitioner was not carrying the gun, and he had no idea that someone had found it. (Tr. 335). Petitioner tried to put a fuel filter on his truck, while Porter was wandering around. (Tr. 335). Putman and Tina left, and petitioner asked Porter to help him with the truck repair. (Tr. 335-36). Porter said he was not really dressed to assist petitioner. (Tr. 336).

Petitioner and Porter then went in petitioner's truck to another house where Porter's van was parked. (Tr. 336). Porter also planned to pick up a check from his mother at that address. (Tr. 336). Porter told petitioner he had been in trouble for felony possession of guns and assaulting two police officers. (Tr. 337). Porter got the check, and they went to town in petitioner's truck to cash it. (Tr. 337-38). They purchased a twelve-pack of beer and cigarettes. (Tr. 338). Petitioner may have already drunk a quart of beer before they made the purchases. (Tr. 338). They returned to hook up Porter's van to petitioner's truck and then drove to Love's Valley. (Tr. 338). Petitioner's truck could not make it up a big hill, however, so he stopped and unhooked the van. (Tr. 339). Porter stayed in the van, because he did not want to get his clothes dirty. (Tr. 339).

The two men returned to town in petitioner's truck to find someone with a truck that could tow the van. (Tr. 339). They drove to the home of petitioner's brother Jimmy Lee Evans, Jr., but nobody was home. (Tr. 339-40). The keys were in the brother's pickup, so they took it. (Tr. 340). They then bought another 12-pack of beer and moved Porter's van to Jerry Putman's backyard, with Porter riding in his van. (Tr. 340). Putman and Tina were not home, so petitioner and Porter returned to town to return the brother's pickup. (Tr. 341). When Porter got out of the van, petitioner noticed he was "acting weird" and "looked a little wired." (Tr. 341).

Petitioner's brother was not home, so they bought more beer. (Tr. 341). They returned to the brother's house and knocked on the door, because petitioner saw the car

belonging to his sister-in-law Jesse Evans.  (Tr. 341).  Ms. Evans answered the door and let them in.  (Tr. 341).  Petitioner introduced Porter as his friend and advised Ms. Evans that the keys should not have been left in the truck, because anybody could steal it.  (Tr. 341-42).  Ms. Evans brought them beer, and Porter used the Evans' phone and remote.  (Tr. 342).  He was acting fidgety and irritating petitioner.  (Tr. 342-43).  Porter also used the bathroom without asking permission and helped himself to beer in the refrigerator.  (Tr. 343).  Petitioner's brother arrived and got Porter out of the house.  (Tr. 343).

At one point at the brother's house, petitioner "playfully" pushed Porter up the steps, and Porter turned around as said:  "[Y]ou know, I can push your nose up through your brain.  Don't push me like that."  (Tr. 343).  Petitioner said he was kidding, but thought Porter probably could make good on his threat.  (Tr. 343).  Petitioner and Porter went back inside the house, got their belongings, and left.  (Tr. 343).  As they were leaving the house, Porter said to petitioner, "I should have balled you up when I had the chance."  (Tr. 343).  Porter did not want to leave, but petitioner walked toward his truck, and Porter eventually followed and got in the truck.  (Tr. 344).  Porter complained about having to leave, because it looked like "things [were] happening." (Tr. 344-45).

Petitioner asked Porter if he wanted to go back to Jerry Putman's house, and Porter replied that was "kind of crappy," because he had been buying beer and cigarettes all day, and he had put gasoline in both vehicles.  (Tr. 345).  He also said petitioner had told him he would fix Porter's vehicle.  (Tr. 345).  As they drove back to the valley, Porter continued to complain about getting his vehicle fixed and not staying at the "party" at the brother's house.  (Tr. 345).  Porter also said they could have "some fun" with petitioner's sister-in-law Jesse, and the brother had a nice car.  (Tr. 345).  Petitioner told Porter he had "about had it" with him and told him to get out of the truck.  (Tr. 345-47).  Porter pulled a gun on petitioner and said they were going down to the river.  (Tr. 347).  Petitioner recognized the gun as his own, and he thought Porter had pulled it from his pants. (Tr. 347).  Porter held the gun with his left hand, as he tried to pull back the hammer.  (Tr. 348, 368-69).  Petitioner could not remember

whether Porter's finger was on the trigger. (Tr. 368-69). Petitioner asked him why he was mad, and Porter said petitioner was "going to have to take his medicine." (Tr. 348).

Petitioner testified he was "totally freaked out" and tried to turn left and take Porter to Jerry Putman's house. (Tr. 348). Petitioner told Porter he could keep the gun, but not to kill him. (Tr. 348). Petitioner, however, missed the last turnoff to Jerry's house, so he continued straight toward the river. (Tr. 348-49).

Petitioner stopped in the middle of the road, as a red truck approached from the other direction. (Tr. 349). He told Porter he thought the people in the red truck were friends, but he actually had no idea who was in the other truck. (Tr. 349). Petitioner got out of his truck, walked to the bumper of the red truck, and asked if there was anybody at Tuck's Ferry. (Tr. 350). A woman was driving, and petitioner noticed her passenger was a small child. (Tr. 350). At that point petitioner realized he had placed the woman and child in danger, because he did not know what Porter would do. (Tr. 351). The driver said nobody was at Tuck's, so petitioner slowly walked back to his truck, not knowing what to do next. (Tr. 351). He walked behind his open truck door, put his hand on the back of the seat, and asked Porter what he was going to do. (Tr. 351). Petitioner also asked Porter if he was going to shoot him in front of the other people, because petitioner had told the other driver to call the police. (Tr. 352). Porter shook his head to express "no" and said petitioner had better not have told her to call the police. (Tr. 352). Porter looked straight ahead with the gun on the seat. (Tr. 352).

The driver of the red truck backed up and whipped her vehicle over to the side, as petitioner stood next to his truck. (Tr. 353). Porter watched her drive by and then watched her in the side-view mirror as she left. (Tr. 353-54). When Porter turned his head to see the red truck leaving, and the back bumpers of the two trucks were even, petitioner grabbed the gun by the barrel and told Porter to get out of the truck. (Tr. 354).

Porter reached around and said, "[Y]ou don't have the . . . ," as he quickly lunged to try to take the gun from petitioner. (Tr. 355-57). Petitioner thought petitioner would kill him

if he regained the gun, and Porter probably would try to stop the other driver from calling the police. (Tr. 356). Petitioner then shot Porter, unloading the gun. (Tr. 355). Petitioner did not think the other driver in the red truck could have seen what happened in her side mirror, as she had testified earlier. (Tr. 358).

Petitioner jumped back in the truck, with Porter slumped against the seat. (Tr. 358). Petitioner thought Porter was "just playing possum" and had not been hurt, because no blood was visible. (Tr. 358-59). Petitioner drove straight ahead, still holding the gun. (Tr. 359). He then noticed blood dripping from Porter's nose. (Tr. 359). When petitioner came to a cul-de-sac, he stopped and pulled Porter out of the truck by his belt loop. (Tr. 359-60). Porter's feet still were in the truck, and the passenger's door was open, so petitioner got back in the truck and spun his tires to get Porter's feet out of the truck and to close the passenger door. (Tr. 360, 387). Petitioner must have run over Porter's legs when he drove off. (Tr. 386-88).

Petitioner went straight to Jerry Putman's house, thinking he needed to return his brother's truck, get a lawyer, and turn himself in. (Tr. 360). At Putman's house, petitioner rinsed blood off the dash and seat, put his brother's belongings from the front seat in Putman's burn barrel, and set it on fire. (Tr. 361, 388). He saw Tina at the house and gave her a twelve-pack of beer to put in the ice box. (Tr. 361). Tina told him that Jerry was in the bathroom. (Tr. 361). Petitioner was headed to his brother's house, when Charlie Parker pulled him over and took his keys. (Tr. 362, 388). He knew why he had been stopped. (Tr. 362). More policemen showed up, and petitioner explained to Highway Patrolman Darian Galloway that "he had to do what he had to do" to protect himself and his family. (Tr. 362-64). He was given his *Miranda* warnings. (Tr. 389).

Petitioner disputed Elizabeth Burton's testimony that she saw him reach behind himself, pull out something, and put it back in the vehicle. (Tr. 364). He said that perhaps he was just pulling his underwear away from his body and rearranging his belt, because he had urinated on himself. (Tr. 364). He denied bringing the gun with him, and stated he was

sure he did not pull a gun from behind his belt and aim it at Calvin Porter. (Tr. 365). He did not take Porter to the hospital, because Porter was dead. (Tr. 367). He testified he did not know why he did what he did, but in response to his attorney's leading questions, he said he was in fear of his life when Porter tried to take the gun from him and when he shot Porter. (Tr. 367).

Calvin Porter's mother Debra Yoe testified that Porter was right-handed. (Tr. 430-31). Paul Abel, the owner and trainer at a shooting and training academy, then testified that a right-handed person would find holding a gun in his left hand to be very foreign. (Tr. 438-444). He opined that if Porter had nothing wrong with his right hand, it would be possible, but not reasonable, for him to hold the gun in his left hand. (Tr. 444-46). Holding the gun in his left hand would have exposed the gun and made him vulnerable to having it taken from him. (Tr. 446). Abel further stated that someone holding the pistol down on the seat in his left hand, and who also had his head turned to the right, probably would fire one shot, if someone tried to take the gun out of his hand. (Tr. 447-48).

### Jury Instructions

Petitioner alleges in Grounds I, II, III, and IV that the trial court erred in (1) its instructions on self-defense, (2) failing to instruct on external circumstances affecting his mental state at the time of the crime, (3) refusing to give an instruction on manslaughter while resisting criminal attempt, and (4) issuing an instruction that he had been impeached. The respondent asserts the trial court properly instructed the jury, and these claims do not raise a constitutional issue warranting federal habeas relief.

> In a habeas corpus proceeding attacking a state court judgment based on an erroneous jury instruction, a petitioner has a great burden. *Lujan v. Tansy*, 2 F. 3d 1031, 1035 (10th Cir. 1993), *cert. denied*, 510 U.S. 1120 (1994). A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial. *Shafer v. Stratton*, 906 F.2d 506, 508 (10th Cir. 1990), *cert. denied*, 498 U.S. 961 (1990). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to

establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (footnote omitted). The question in this proceeding is not whether the instruction is "undesirable, erroneous, or even 'universally condemned,'" but whether the instruction so infected the trial that the resulting conviction violates due process. *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)). . . . The degree of prejudice from the instruction error must be evaluated in the context of the events at the trial. *United States v. Frady*, 456 U.S. 152, 169 (1982).

*Maes v. Thomas*, 46 F. 3d 979, 984 (10th Cir.), *cert. denied*, 514 U.S. 1115 (1995).

### *Ground I: Self-Defense Instructions*

Petitioner claimed he was acting in self-defense when he shot and killed Calvin Porter. His requested self-defense instructions were given (Instructions 13-15, O.R. 160-62), but he alleges additional, irrelevant and inconsistent instructions (Instructions 16-19, O.R. 163-66), along with the prosecutor's misleading argument, erroneously led the jury to believe he was not entitled to the defense of self-defense. On direct appeal the Oklahoma Court of Criminal Appeals (OCCA) found "the self-defense instructions requested by defense counsel and given by the trial court were appropriate under the facts of this case." *Evans v. State*, No. F-2007-424, slip op. at 2 (Okla. Crim. App. Oct 16, 2008) (citing *Hancock v. State*, 155 P.3d 796, 819-20 (Okla. Crim. App. 2007)).

Petitioner is complaining that these "irrelevant" instructions told the jury that the defense of self-defense is unavailable to anyone who (1) was the aggressor, (2) provoked his attacker with the intent to cause the altercation, or (3) voluntarily entered into mutual combat. (Instructions 16-19, O.R. 163-66). The disputed instructions are as follows:

INSTRUCTION NUMBER 16
Self-defense is permitted a person solely because of necessity. Self-defense is not available to a person who was the aggressor, provoked another with the intent to cause the altercation or voluntarily entered into mutual combat, no matter how great the danger to personal security became during the altercation unless the right of self-defense is reestablished. CR 8-50

INSTRUCTION NUMBER 17
A person who was the original aggressor and/or provoked another with intent to cause the altercation and/or voluntarily entered into mutual combat may regain the right to self-defense if that person withdrew or attempted to withdraw from the altercation and communicated his desire to withdraw to the

other participant in the altercation. If, thereafter, the other participant continued the altercation, the other participant became the aggressor and the person who was the original aggressor and/or provoked another with the intent to cause the altercation and/or voluntarily entered into mutual combat is entitled to the defense of self-defense. CR 8-51

INSTRUCTION NUMBER 18
A person who was not the aggressor, did not provoke another with intent to cause an altercation or did not voluntarily enter into mutual combat has no duty to retreat, but may stand firm and use the right of self-defense. CR 8-52

INSTRUCTION NUMBER 19
A person is an aggressor when that person by his wrongful acts provokes, brings about, or continues an altercation. The use of words alone cannot make a person an aggressor. CR 8-53

Petitioner concedes these instructions were identical to Instructions 8-50 through 8-53, OUJI-CR(2d), and correctly stated the law in the abstract. He, however, contends the four instructions should not have been given, because there was no dispute about who was at fault for the fight. In addition, there was no evidence that he was the aggressor, that he provoked the victim with the intent to cause the altercation, or that he voluntarily entered into mutual combat.

The respondent maintains that Instructions 16 through 19 were properly given, because the facts of the case did give rise to a dispute as to which party was at fault. Petitioner testified at trial that the victim pulled the gun on him, and petitioner grabbed it and shot the victim when the victim lunged for it. (Tr. 346-48, 354-58). Therefore, such a dispute existed. The Committee Comments on the OUJI Instructions provide that:

[Instructions 8-50 to 8-53] should be used only when a dispute exists as to whether the defendant or other participant in the altercation was at fault. When such a dispute exists, all four instructions should be given so the jury will be clearly informed as to the respective rights of the parties. Failure to give these four instructions would mean that the trial court had improperly assumed that the defendant was the aggressor.

Committee Comments, Instruction 8-53, OUJI-CR(2d). Here, the jury was to determine whether petitioner lawfully reacted to the actions of the victim, or whether he was at fault, thereby acting unlawfully. The jury was properly instructed in accordance with the Uniform

Jury Instructions, which "shall be used unless the court determines that the instruction does not accurately state the law." *Hammon v. State*, 999 P.2d 1082, 1099 (citing Okla. Stat. tit. 12, § 577.2).

The respondent further asserts that evidence was presented supporting each instruction regarding the unavailability of the defense of self-defense. Elizabeth Burton testified that petitioner returned to his truck and stood behind the open driver's door after talking to her. (Tr. 139). Petitioner reached behind his back and pulled something from the back of his shirt. (Tr. 139-40). He held whatever he pulled from his shirt behind the open truck door, and she watched as he stood outside the driver's side of the truck talking to his passenger. (Tr. 140). The victim was shaking his head, but she did not know if they were arguing, because neither raised his voice or acted erratically. (Tr. 140).

Ms. Burton drove on the grass to get around petitioner's truck. (Tr. 142). With her windows rolled down, she watched petitioner's truck in her side-view mirror when she got back on the road. (Tr. 142, 151). She saw petitioner raise his arm and shoot three times. (Tr. 142). She heard three gunshots. (Tr. 142). She never saw a struggle between petitioner and the passenger, never saw the passenger move, and never saw petitioner move from his standing position beside the driver's side of the truck. (Tr. 143). She only saw the two men looking at each other until petitioner raised his arm, shot the passenger three times in the head, and the passenger's head dropped forward. (Tr. 143).

The respondent contends, and this court agrees, that by walking back to his truck and pulling a gun on Calvin Porter, the jury could find petitioner was provoking the victim with the intent that a deadly conflict would result. (Instruction 16, O.R. 163). The court further finds that if, as petitioner claims, the evidence did not show he was the aggressor, that he provoked the victim, or that he entered into mutual combat, the jury would not have applied the disputed instructions, because "[i]t is well established that juries are presumed to follow their instructions," *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Petitioner also complains the prosecutor made the following improper arguments

based on the self-defense instructions:

> . . . After he went back to--after he got out of the pickup and went to Elizabeth Burton's car, assuming that everything he says is true, assuming everything in the world he says is true, what does the judge tell you about that? No. 19. No. 19. A person is an aggressor when that person by his wrongful acts provokes, brings about or continues--or continues--an altercation. The altercation--assuming everything he says is true--the altercation is over when he gets out of his yellow pickup and walks over there to Elizabeth Burton's red pickup. But he returned. It's not believable that Calvin had the gun, it's not believable, it's not believable. Calvin is right-handed. Calvin was no threat when the Defendant had the gun. Another thing assuming everything that he says is true when the Defendant takes the gun away, it's pretty much over. Calvin is not a threat to him when he takes the gun away.
>
> Let's see what the Judge tells you about that. No. 17. I'm going to read starting in the middle, down toward the middle, where the Judge says: "If, thereafter, the other participant continued the altercation . . . ." He continued the altercation twice. According to his story, when he walked back to his pickup he continued it once. When he took the gun away from Calvin, according to his story, he continued it twice. According to his story, the other participant became the aggressor. Even with his story he's guilty. Even if his story is 100 percent true he's guilty because when he got the gun he's the aggressor.

(Tr. 487-88).

The record shows there was no objection to this argument at trial, so the OCCA's review was limited to plain error. *Matthews v. State*, 45 P.3d 907, 920 (Okla. Crim. App.), *cert. denied*, 537 U.S. 1074 (2002). Counsel's failure to object to the prosecutor's statements, while not dispositive, is relevant to the assessment of fundamental unfairness. *Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999), *cert. denied*, 531 U.S. 835 (2000).

Petitioner asserts the prosecutor's argument regarding Instruction No. 17 was improper, because the instruction is intended for cases in which the defendant was the original aggressor, but withdrew, and the victim became the aggressor, thus re-establishing the defendant's right to use self-defense. Petitioner claims that whether the victim was acting in self-defense was not an issue at trial, and the instruction only can be used where the defendant was the original aggressor. Here, the court finds there was a dispute about who was the original aggressor, and there was no constitutional error in the prosecutor's statement

about the instructions.

### Ground II: Failure to Instruct on External Circumstances

Petitioner next alleges the trial court erred in failing to instruct the jury that the external circumstances surrounding the commission of a homicidal act may be considered in determining the defendant's mental state:

> The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life. External circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act.

Instruction 4-63, OUJI-CR (2d). The OCCA rejected this claim on direct appeal:

> . . . [T]he failure to instruct the jury that they could determine whether or not deliberate intent existed from external circumstances did not amount to reversible error. Other instructions told the jury that they must determine their verdict from all of the facts and circumstances appearing in evidence and coming to their observation during the trial. They were instructed that they could only find guilt after finding all of the elements beyond a reasonable doubt, and that Evans did not act in self-defense. Thus the instructions, taken as a whole, fairly stated the applicable law. *Littlejohn v. State*, 181 P.3d 736, 741 (Okla. Crim. App. 2008). The failure to give this instruction did not cause the jury to presume that an element of the offense was already decided for them, as there is no indication that they determined the requisite intent from the fact of the killing alone. *See Sandstrom v. Montana*, 442 U.S. 510 (1979).

*Evans*, No. F-2007-424, slip op. at 2-3.

The record shows that petitioner requested this instruction, but it inadvertently was not included in the instructions given to the jury. There is nothing in the record, however, indicating petitioner objected to the exclusion. Again, he has waived this claim for all but plain error. *Romano v. State*, 909 P.2d 92, 120 (Okla. Crim. App. 1995).

"Unless the constitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny the petitioner due process." *Tiger v. Workman*, 445 F.3d 1265, 1267 (10th Cir. 2006) (citations omitted). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 145 U.S. at 155.

Here, the court agrees with the OCCA that when the instructions are taken as a whole, the jury was fairly instructed on the applicable law. *Evans*, No. F-2007-424, slip op. at 2. The court further finds that this omission did not deny petitioner a fair trial.

### Ground III: Failure to Instruct on Manslaughter While Resisting Criminal Attempt

Petitioner next complains he was denied due process when the trial court refused to give his requested instruction on Manslaughter while Resisting Criminal Attempt, Okla. Stat. tit. 21, § 711(3), when the evidence clearly supported it. (Tr. 465). The requested instruction set forth the following elements of the crime:

First, the death of a human;

Second, perpetrated unnecessarily **(while resisting an attempt by the deceased to commit a crime)/(after an attempt by the deceased to commit a crime had failed)**;

Third; perpetrated by the **defendants(s)**.

Instruction 4-102, OUJI-CR (2d) (emphasis in original).

Petitioner argued on direct appeal that the instruction was appropriate, because petitioner testified that Porter had brandished a gun while stating his intention to take petitioner to the river where he would have to "take his medicine," and petitioner believed Porter intended to kill him. (Tr. 346-48, 352, 358). Petitioner testified he successfully wrested the gun from Porter's possession and then shot Porter as Porter lunged for the gun. (Tr. 354-55).

The trial judge explained his reasoning for not giving this instruction:

. . . [A]t the time the shooting occurred the Defendant was in control of the sole and only firearm there. The decedent was not attempting at that time to commit any crime that the Court is aware of. He lunged for the gun and that's when the Defendant shot him by the Defendant's testimony. In the best light the decedent was not trying to commit an offense. That's why the Court is not giving those instructions. Prior to that time when the decedent held a firearm, if he did, you may have been entitled to that instruction if the Defendant had shot him while the decedent was holding a firearm or reaching for a firearm or something of that sort. That's not the evidence of the case.

(Tr. 466). On direct appeal, the OCCA found "the trial court did not abuse its discretion in

failing to give the requested lesser-related instruction on manslaughter by killing another while unnecessarily resisting a criminal attempt." *Evans*, No. F-2007-424, slip op. at 3 (citing *Hancock*, 155 P. 3d at 819-20).

"[A] petitioner in a non-capital case is not entitled to habeas relief for the failure to give a lesser-included offense instruction, 'even if in our view there was sufficient evidence to warrant the giving of an instruction on a lesser included offense.'" *Lujan v. Tansy,* 2 F.3d 1031, 1036 (10th Cir. 1993), *cert. denied*, 510 U.S. 1120 (1994) (quoting *Chavez v. Kerby,* 848 F.2d 1101, 1103 (10th Cir. 1988)). *See also Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004). Therefore, this ground for habeas relief fails.

### Ground IV: Impeachment Instruction

Petitioner claims the trial court erred in issuing an instruction the petitioner had been impeached when there was no supporting evidence for the instruction. The disputed instruction reads:

> INSTRUCTION NUMBER 5
>
> Evidence has been presented that the Defendant has committed conduct that may affect his credibility. This evidence is called impeachment evidence, and it is offered to show that the defendant's testimony is not believable or truthful. If you find that this conduct occurred, you may consider this impeachment evidence in determining what weight and credit to give the credibility of the defendant. You may not consider this impeachment evidence only to the extent that you determine it affects the believability of the Defendant, if at all.

(O.R. 150).

The OCCA found there was no objection to the instruction, so the claim was reviewed only for plain error. *Evans*, No. F02007-424, slip op. at 3 (citing *Lay v. State*, 179 P. 615, 622 (Okla. Crim. App. 2008)). There was no plain error, however, because the instruction "did not go to the foundation of the case nor [sic] take away from Evans a right essential to his defense." *Id.* (citing *Hogan v. State*, 139 P.3d 907, 923 (Okla. Crim. App. 2006)).

The respondent maintains the instruction was proper, because it was supported by the evidence. In the State's case-in-chief, Daniel Howard testified that when he told petitioner

that Porter had sold Epsom salt as methamphetamine, petitioner said, "[B]etter not nobody sell me none of that or I'm going to kill them." (Tr. 125). Petitioner continued in his response to Howard, "[B]ack in the old days you wouldn't do that . . . back in the old days you'd get yourself killed." (Tr. 125).

Oklahoma Highway Patrol Trooper Darian Galloway testified that after petitioner's truck was pulled over on the day of the crime, petitioner first asked if he was being detained for "weed," and stated, "You never piss off a grower." (Tr. 207-08). Galloway understood both "weed" and "grower" to be references to marijuana. (Tr. 208). Petitioner then told Galloway he was worried about protecting his family, and "A man's got to do what a man's got to do." (Tr. 208-09). In referring to the sheriff, petitioner told Galloway, "Joe has whacked people, too." (Tr. 208).

On cross-examination petitioner expressly denied making the statement to anyone about "back in the old days." (Tr. 394). Regarding petitioner's statements to Trooper Galloway about a "grower," petitioner testified, "I absolutely did not say those words. Those words did not come out of my mouth at all. I did not say that. I didn't say anything about growers or anything like that to him, no." (Tr. 364). Petitioner also denied using the term "whack" when speaking to Trooper Galloway, and he testified he only said he could "imagine how Joe Russell would feel having to shoot somebody . . . ." (Tr. 364).

Under Oklahoma law, "It is proper to bring before the trier of facts prior inconsistent statements of the accused for the purpose of evaluation of credibility of the accused as a witness." *Wald v. State*, 513 P.2d 330, 334 (Okla. Crim. App. 1973). *See also Harris v. New York*, 401 U.S. 222, 225 (1971) ("Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process."). As set forth above, petitioner's credibility as a witness was an issue, so the instruction was proper.

### Ground V: Booking Photograph

Petitioner alleges the trial court erred in admitting, over his objection, his booking

photograph because of its unfairly prejudicial effect and lack of relevance. In an in-chambers hearing before the trial began, the prosecutor announced his intention to submit the photograph, because petitioner's appearance the day of trial was different. The prosecutor stated, he "would be arguing that that's admissible in regard to his character." (Tr. 9). Defense counsel stated he would object if the photograph showed petitioner "in jail suits or showing a sign and stuff like that." (Tr. 9-10). Defense counsel also said that showing a photograph of petitioner in jail clothing would be like bringing him for trial in handcuffs, and he did not want the jury to see that. (Tr. 10). The trial judge said he was not aware of any law that did not allow admission of a booking photograph. (Tr. 10).

While cross-examining petitioner during the defense's presentation, the State moved to admit State's Exhibit 20 (Docket No. 12, Exhibit 10), which was petitioner's booking photograph. The color photo shows petitioner standing in front of a lined height chart, holding a placard with the words "County City Jail Marietta, Oklahoma" and a number. Petitioner objected that the photo proved nothing, and it was far more prejudicial than probative. (Tr. 392-93). The court overruled the objection and allowed the photograph to be published to the jury. (Tr. 393).

Before offering the photo, the prosecutor remarked to petitioner, "[Y]ou look very nice in court today." (Tr. 392). This "compliment" on petitioner's courtroom appearance was followed by the State's offer of the picture showing how petitioner looked on May 22, 2006. (Tr. 392). Petitioner argued on direct appeal that this so-called "character" evidence of petitioner's unkempt and hollow-eyed appearance was only intended to suggest he had the moral qualities of an outlaw. Furthermore, he argued the exhibit clearly was a jail photograph, which prejudicially depicted him as a criminal. The OCCA held that the admission of the unredacted photograph was error. *Evans*, No. F-2007-424, slip op. at 3. The error, however, "was harmless as it did not result in a miscarriage of justice or constitute a substantial violation of any of Evan's constitutional or statutory rights." *Id.* (citing Okla. Stat. tit. 20, § 2104).

The respondent asserts this claim concerns an issue of state law, and any error was harmless. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citing 28 U.S.C. § 2241). "Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999), *cert. denied*, 531 U.S. 833 (2000). After careful review, the court finds the erroneous admission of petitioner's photograph was harmless error, and it did not render the proceedings fundamentally unfair and result in a denial of due process. *See Jackson v. Shanks*, 143 F.3d 1313, 1322 (10th Cir.), *cert. denied*, 525 U.S. 950 (1998). This ground for relief fails.

### Ground VI: Hearsay Evidence

Petitioner next complains that the prosecutor elicited hearsay evidence that was prejudicial to him, when Jerry Putman testified about petitioner giving beer to Putman's girlfriend Tina Wallace after the homicide:

> Q: Tina asked him [petitioner], she said, well, where's Cal, right?
>
> A: Yeah, I heard that.
>
> Q: He said, oh, I dropped him off, right?
>
> A. Yeah.

(Tr. 195). Petitioner argued on direct appeal that the questions were framed to make Putman's answers seem to indicate he heard Ms. Wallace ask petitioner about Porter's whereabouts and that he heard petitioner's responses. It became apparent, however, that Putman had not personally heard the conversation between petitioner and Tina, and he only had heard about it. The prosecutor asked,

> Q: But when Tina asked where's Cal he also said, oh, I dropped him off, right?
>
> A: I didn't hear that part of what Tina said on the front porch. I just heard Jeff say, here's some beer, put it in the ice box and I'll be back later. I didn't hear the part about him saying he'd dropped Cal off.

22

(Tr. 196).

Petitioner contends that once Putman revealed he had not personally heard petitioner make the statement, it was obvious the testimony was hearsay. Defense counsel, however, failed to object and ask that the jury be admonished not to consider this evidence. The OCCA held that because there was no objection, it could review only if petitioner's substantial rights were affected. *Evans*, No. F-2007-424, slip op. at 3. Because it further found "the hearsay did not adversely affect Evan's substantial rights," however, no relief was warranted. *Id.*

Petitioner's hearsay claim is a matter of state law, and relief cannot be granted unless petitioner's conviction violated the United States Constitution, federal laws, or treaties. *Estelle*, 502 U.S. at 67. This state law evidentiary error was harmless, and petitioner was not denied due process by its admission. *See Jackson*, 143 F.3d at 1322.

### Ground VII: Ineffective Assistance of Trial Counsel

Petitioner presents four alleged instances of ineffective assistance of trial counsel, relating to Grounds I, II, IV, and VI. He alleges he was denied the effective assistance of trial counsel, when counsel undermined the defense of self-defense by requesting inappropriate instructions suggesting petitioner might not be entitled to defend himself. Petitioner also complains that counsel failed to object when the prosecutor used these instructions to mislead the jury about the full nature of petitioner's right to defend himself. In addition, counsel failed to notice that the requested instruction concerning the external circumstances surrounding the homicide was not given. Petitioner further alleges counsel failed to object (1) when the court instructed the jury that petitioner's credibility had been impeached, when no impeachment evidence had been presented, and (2) when prejudicial hearsay was presented.

On direct appeal the OCCA denied relief:

> . . . [W]e find that Evans has not shown that counsel was ineffective, because he has not shown a reasonable probability that, but for counsel's unprofessional errors relating to [Grounds II, IV, and VI], the result of the

23

proceeding would have been different. He has not shown that counsel's conduct regarding the self-defense instructions, raised in [Grounds I], fell below the range of reasonable professional conduct. *See Strickland v. Washington*, 466 U.S. 668 (1984).

*Evans*, No. F-2007-424, slip op. at 4.

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"There is a strong presumption that counsel provided effective assistance of counsel and petitioner has the burden of proof to overcome that presumption." *United States v. Rantz*, 862 F.2d 808, 810 (10th Cir. 1988) (citing *United States v. Cronic*, 466 U.S. 648, 658 (1984)), *cert. denied*, 489 U.S. 1089 (1989). In *Strickland* the United States Supreme Court set forth the two-part test for determining the validity of a habeas petitioner's claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

As set forth above, there is no merit in petitioner's claims regarding the instructions on self-defense (Ground I), the court's failure to instruct on external circumstances affecting petitioner's mental state at the time of the crime (Ground II), the impeachment instruction (Ground IV), or the hearsay evidence (Ground VI). Failure to present a meritless argument does not constitute ineffective assistance assistance of counsel. *Martin v. Kaiser*, 907 F.2d

931, 936 (10th Cir. 1990) (citing *Strickland*, 466 U.S. at 691-96). The court, therefore, finds the determination by the OCCA was consistent with clearly established federal law, and that decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Ground VII fails.

### Ground VIII:  Cumulative Error

Petitioner alleges the cumulative effect of the errors in Grounds I-VII deprived him of a fair trial and a reliable verdict. The OCCA found the errors identified in his direct appeal did not warrant relief, "even when combined and viewed in a cumulative fashion." *Evans*, No. F-2007-424, slip op. at 4.

"Cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir.), *cert. denied*, 522 U.S. 844 (1997) (citing *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990)). *See also Castro v. Ward*, 138 F.3d 810, 832-33 (10th Cir.), *cert. denied*, 525 U.S. 971 (1998); *Le v. Mullin*, 311 F.3d 1002, 1023 (10th Cir. 2002), *cert. denied*, 540 U.S. 833 (2003) ("When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated.").

After careful review, the court finds the few errors in this case did not significantly strengthen the State's prosecution or diminish petitioner's defense. Therefore, the OCCA's determination of this claim was consistent with federal law, and relief is not warranted. *See* 28 U.S.C. § 2254(d).

### Grounds IX-XXI

Grounds IX through XX allege substantive claims that were not raised on direct appeal, but first were raised through an application for post-conviction relief. The OCCA found these substantive claims were waived, because the claims could have been raised on direct appeal, but were not. *Evans*, No. PC-2009-995, slip op. at 2 (Okla. Crim. App. Mar. 8. 2010).

In all cases in which a state prisoner has defaulted his federal claims in state

court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Tenth Circuit has acknowledged Oklahoma's consistent application of the "waiver" rule in appellate proceedings and that the OCCA's procedural bar rests on an adequate and an independent state ground. *Steele v. Young*, 11 F.3d 1518, 1522 (10th Cir. 1993).

"'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753. With respect to the "prejudice" prong of the "cause and prejudice" requirement, a petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

In Ground XXI petitioner challenges these substantive issues though a claim of ineffective appellate counsel, alleging appellate counsel failed to raise the claims on direct appeal, and this failure is petitioner's "cause" for not properly presenting the claims to the state courts.

The *Strickland* test also applies to assessing the effectiveness of appellate counsel. *See United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995). When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, we first examine the merits of the omitted issue. If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance. *See Parker v. Champion*, 148 F.3d 1219, 1221 (10th Cir. 1998) (citing *Cook*, 45 F.3d at 392-93), *cert. denied*, 525 U.S. 1151 (1999)). If the issue has merit, we then must determine whether counsel's failure to raise the claim on direct appeal was deficient and prejudicial. *See Cook*, 45 F.3d at 394.

*Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999). Therefore, the court must address the merits of petitioner's claims in Grounds IX-XX.

### IX: Prosecutorial Misconduct Regarding Gun Demonstration

Petitioner alleges he was denied a fair trial when on cross-examination the prosecutor caused him to demonstrate how he used the gun to kill Porter. The respondent asserts the demonstration was proper, because the issues concerned the circumstances surrounding the shooting, the legitimacy of petitioner's alleged fear, and how the gun was positioned and used when petitioner shot Porter. The circumstances surrounding the shooting are relevant under Oklahoma law for the purpose of proving intent for first degree murder. *Phillips v. State*, 989 P.2d 1017, 1029 Okla. Crim. App. 1999), *cert. denied*, 531 U.S. 837 (2000).

> In a habeas corpus action, claims of prosecutorial misconduct are reviewed only for a violation of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citations and quotations omitted). In order to be entitled to relief, [petitioner] must establish that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. This determination may be made only after considering all of the surrounding circumstances, including the strength of the state's case. *See Darden*, 477 U.S. at 181-82.

*Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005), *cert. denied*, 547 U.S. 1181 (2006).

During direct examination defense counsel asked petitioner to demonstrate what happened in the vehicle after petitioner allegedly took the gun from Porter. (Tr. 354-55). Defense counsel also questioned petitioner about his distance from Porter and the position of petitioner's hands. (Tr. 355-57, 359). When petitioner took the stand, he was subject to cross-examination, just as any witness. *Wald v. State*, 513 P.2d 300, 334 (Okla. Crim. App. 1973). On cross-examination petitioner demonstrated the shooting without objection from defense counsel. (Tr. 375, 379-384).

Petitioner now complains about the prosecutor's request for the demonstration, but he fails to set forth how he was prejudiced by demonstrating his own version of the crime. Considering the strength of the State's case, the court finds there was no prejudice and no

denial of due process. Therefore, appellate counsel was not ineffective in failing to raise this issue.

### *Ground X:  Competency to Testify*

Petitioner next alleges he was denied a fair trial, because the trial court failed to adequately investigate his competency to testify, after becoming aware petitioner was taking narcotics. The record shows that before petitioner testified, the court questioned him outside the hearing of the jury. (Tr. 319). Petitioner was specifically questioned about his medication:

> THE COURT:  I understand you're taking some kind of medication, is that correct?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  Does it affect your ability to think or reason?
>
> THE DEFENDANT:  Not really.  It's Valium and Lortab.
>
> THE COURT:  You're taking Valiums and you're taking Lortabs today?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Are you thinking clearly?
>
> THE DEFENDANT:  I believe so.  I think so.
>
> THE COURT:  Do you understand what's going on?
>
> THE DEFENDANT:  Yes, sir.  I understand.
>
> THE COURT:  Do you understand that Lortab and Valium can cloud your ability to think or reason?
>
> THE DEFENDANT:  Yes, I do.
>
> THE COURT:  And you've discussed this with your attorney, is that right, Mr. Buck?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  Mr. Buck, do you agree he's competent?
>
> MR. BUCK:  Yes, sir, Judge.  Just for the record, his normal dosage, we cut

that down today.  He's on pain medication for his prior injuries and we talked about it prior to today and we cut the dosage down just in case there was some kind of issue on that.  Instead of taking--he just took a half.  And that was at 10:30, is that correct, sir?

THE DEFENDANT:  Yes, sir.

THE COURT:  And it's now 1:15.  Do you agree you're lucid and competent, sir?

THE DEFENDANT:  I believe I'm competent, Your Honor.

THE COURT:  You believe you're competent?

THE DEFENDANT:  I believe I'm competent.

(Tr. 321-22).

Petitioner contends his medications affected his behavior at trial and caused him to respond inappropriately to questions posed to him, as demonstrated by his mental confusion, disorientation, and faulty memory.  As a result, he was admonished by the court both within and outside the jury's presence.

The court has reviewed the instances in the trial transcript cited by petitioner and finds his alleged inappropriate responses resulted in the court's telling him to (1) answer the questions posed to him (Tr. 375, 377, 396, 398, 399, 400); (2) give verbal responses instead of shaking his head (Tr. 380, 386, 388); and (3) not to make additional inappropriate comments, such as when he told one of the defense witnesses that he loved her.  (Tr. 274-76). At one point, the trial judge admonished petitioner outside the hearing of the jury:

THE DEFENDANT:  Sorry, Your Honor.

MR. BUCK:  Be quiet, Jeff.

THE COURT:  Mr. Evans, I realize that you're on trial and that the ultimate sentence in this case could be life without the possibility of parole.  I understand the stakes.  I understand the tensions.  Surprisingly enough, I've defended cases like this, but I'm going to give you one more admonition.  I've told you more than once and I'm giving you one more.  Answer only the question asked and do not make spontaneous comments or extraneous comments.  Do you know what "extraneous" means?

THE DEFENDANT:  Extra?

THE COURT: Yes, sir. Answer only the question because if you do that anymore I'm going to hold you in direct contempt of Court. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: That's punishable by six months in the County Jail and/or fine of $500. Now, I told you not to do it. I told you to answer only the question asked and I've done it politely several times. I sent the jury out of the room so you would know I'm serious about it. I understand the stakes, but we have rules of evidence just like any other courtroom in a murder trial and you're subject to those rules. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. If you violate my admonition I will do whatever is necessary at the end of the trial. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you have any questions about that?

THE DEFENDANT: No.

THE COURT: Mr. Buck has a right to re-direct here and he has a right to ask you questions about anything that Mr. Brown has asked questions about. He can follow up and he can ask you about whatever you think you need to tell us subsequent to one of his questions. Do you understand that?

THE DEFENDANT: I didn't understand that part. I do now.

THE COURT: Well, it's been going on all day long. Do you understand that? It's direct, cross and re-direct. Have you not heard that happening?

THE DEFENDANT: I haven't noticed it, but I see it now. I see the pattern.

THE COURT: Mr. Evans, you need to listen to your attorney. I'm going to give you a couple of minutes to talk to your attorney and then we're going to go right back into this cross-examination. If I hear anymore [sic] extraneous stuff, anymore [sic] responses that are unresponsive or anymore [sic] answers that only require a yes or no or something, whatever the answer may be you answer the question and then close your mouth. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: The State, like you, has a right to a fair trial and that's what I'm trying to do. Do you understand that?

THE DEFENDANT:  I see that.

THE COURT:  Mr. Buck, talk to your client privately.

(Brief interruption.)

MR. BUCK:  Judge, before the jury comes back in may I make a slight record?

THE COURT:  Sure.

MR. BUCK:  I would just like to say, Judge, that I've advised my client to answer the questions that go on in there.  However, at this point in time if the questions continue as they are I feel like there's a certain badgering going on here.  I don't want to waste the Court's time, but I will be making serious, numerous objections if it continues like this.  I think he's being very argumentative in his questioning.  Most of these questions have already been asked and answered.  It's just a matter of badgering the witness.

THE COURT:  Sir, I don't agree with you, but if it's argumentative, and you make an argumentative objection and it's argumentative, I will certainly sustain it as I have.

MR. BUCK:  Thank you.

(Tr. 401-04).  Petitioner did not violate the court's admonishment after this final warning.

Petitioner also alleges the medications caused a state of mental confusion or disorientation and faulty memory.  The court has carefully reviewed his testimony, however, and finds no support for this claim.  Oklahoma's "state procedures mandate a court-ordered evaluation only when sufficient doubt as to the defendant's competency to stand trial has been raised, thereby ensuring the defendant's due process rights to be tried while legally competent." *Gilbert v. State*, 951 P.2d 98 (Okla. Crim. App. 1997).

> An accused is presumed to be competent to stand trial and has the burden of proving his incompetence.  *Bryson v. State*, 876 P.2d 240, 249 (Okla. Crim. App. 1994), *cert. denied*, 513 U.S. 1090 (1995). . . . The test to be used . . . is whether the accused has sufficient ability to consult with his lawyer and has a rational as well as actual understanding of the proceedings against him.  *Id*.  The determination of whether a sufficient doubt has been raised regarding a defendant's competency is left to the trial judge.  *Id.*  Such determination is based upon the particular facts and circumstances of each case.  *Id.*  The trial court is not required to give controlling effect to the opinions of experts, but may rely on the opinion of lay witnesses and the court's own observations of the defendant. *Id*., *Cooper v. State*, 889 P.2d 293, 304 (Okla. Crim. 1995), *overruled on other grounds, Cooper v. Oklahoma*,

517 U.S. 348 (1996). . . .

*Gilbert*, 951 P.2d 102.

In this case, the trial judge carefully questioned petitioner and his attorney about any adverse effects from the medications, and both petitioner and his counsel stated he was competent and understood the proceedings. This court finds that during the course of the trial, there was no indication that petitioner did not understand the proceedings or that he was not able to assist in his defense. To the contrary, the record reveals that petitioner, while sometimes appearing to try to control his questioning, was able to correct his behavior and respond appropriately after the judge explained the process and warned him to follow the court's instructions. Therefore, petitioner was not denied his right to a fair trial when the court did not further investigate his competency with respect to his medications, and appellate counsel was not ineffective in not presenting the claim.

### Grounds XI and XII: Discovery Violation and Failure to Conduct Fingerprint Analysis

OSBI criminalist Roger Marrs testified that an email was sent by OSBI agent David Seals to Sara Ferrero, also of the OSBI, advising that the gun suspected as the murder weapon did not need to be tested for fingerprints. (Tr. 247). Defense counsel stated at trial that the State had failed to provide the defense a copy of the email, but the prosecutor told the court that the email had been disclosed to the defense. (Tr. 248-49). Petitioner asserts this alleged failure to disclose cast the case in a different light and deprived him of evidence material to guilt and punishment, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). He also claims he was denied due process of law, because the OSBI agents acted in bad faith in their deliberate failure to conduct a fingerprint analysis on the murder weapon.

*Brady* held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United*

*States v. Bagley*, 473 U.S. 667, 682 (1985). The OCCA has adopted *Brady* and its progeny as the appropriate standard of review for determining whether a prosecutor has withheld exculpatory evidence from the defense in violation of the Due Process Clause. *Gates v. State*, 754 P.2d 882, 886-87 (Okla. Crim. App. 1988).

Petitioner testified that Porter held him at gunpoint under threat of death, until petitioner wrested the gun from Porter. Petitioner further claimed that when Porter attempted to regain control of the weapon, petitioner fired it. He contends the email was evidence that the State was attempting to negate his version of events.

OSBI Agent David Seals, the author of the email, was called by the State as a rebuttal witness, and defense counsel exercised his right to cross-examine Seals. (Tr. 434-37). Seals testified that the entire interior of the truck in which the murder was committed had been washed out and was damp when the truck was seized. (Tr. 435). The gun was located in this damp environment. (Tr. 435). After consulting with the senior fingerprint examiner about the degraded condition of the weapon found in a wet pickup, Seals and the senior fingerprint examiner determined "there was little or little or no chance of getting prints of comparable value from the gun." (Tr. 434).

After review of the record, the court finds petitioner has failed to show any material, exculpatory evidence was suppressed by the State, or that any of the evidence presented at trial was different from the evidence he received in discovery. While it was disputed whether there was any evidence that was not disclosed to defense counsel, the defense was able to thoroughly question the author of the email, and the reasons for not fingerprinting the gun were thoroughly explained at trial. The OCCA, therefore, would have denied relief on these claims on direct appeal, and appellate counsel was not ineffective in not raising the claim.

**Grounds XIII and XIV: Testimony by Investigator from Medical Examiner's Office**

Petitioner alleges in Ground XIII that he was denied due process when John Miller, an investigator for medical examiner's office, testified outside his personal knowledge regarding Porter's autopsy. Miller also allegedly testified outside his area of expertise

regarding evidence of the gun's distance from the victim when it was fired.

The record shows that Miller was a State's witness who testified in his capacity as an investigator for the state medical examiner's office. (Tr. 154). On the day of the murder, he was sent to the site where Porter's body was found. (Tr. 155). At trial he described photographs he had taken at the crime scene, along with some morgue photos of Porter's body. (Tr. 155-57, 159-60). He also commented on the bullets and the locations of bullet wounds. (Tr. 159-60). Miller opined about matters within his knowledge as an investigator, not as a physician, but did not give his opinion about the autopsy, so Ground XIII of this petition is meritless.

Miller also testified that there was no soot or stippling indicated in the autopsy report, and he explained that the presence of soot and stippling on a body would depend on the type of weapon used and the distance involved. (Tr. 168). He further testified that the question of how close the gun would need to be to result in soot and stippling was beyond his area of expertise. (Tr. 168). He said he would expect the gun would have had to have been closer than two feet, but again stated to get the correct answer, a firearms examiner would need to test-fire the weapon with the same ammunition. (Tr. 168).

The Court of Criminal Appeals has allowed an investigator from the medical examiner's office to give his expert opinion in a trial. *Diaz v. State*, 728 P.2d 503, 514 (Okla. Crim. App. 1986). ("The decision as to the sufficiency of the qualifications of an expert witness is within the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion."). Even if this issue had been raised on direct appeal, it would have failed. Appellate counsel was not ineffective in failing to raise Grounds XIII and XIV.

### Grounds XV: Other Prosecutorial Misconduct

Petitioner next presents a lengthy list of alleged prosecutorial misconduct that he claims denied him a fair trial:

A.     During redirect examination of State's witness Jerry Putnam, the prosecutor

accused Putnam of associating with methamphetamine users and dealers. (Tr. 199). The record shows that Putnam admitted he had a friend who purchased Epsom salt from Calvin Porter, but the friend thought he was buying methamphetamine. (Tr. 199). He further stated he knew other people who were buying and selling methamphetamine. (Tr. 199).

B.      During cross-examination of defense witness Jesse Evans, the prosecutor accused her of corroborating her testimony with other witnesses, while waiting outside the courtroom. (Tr. 269). The prosecutor also referred to Ms. Evans as "not [a] fair and impartial witness" who "would say anything to help [petitioner]," and improperly commented that she was a very close relative to petitioner. (Tr. 270-71).

The record shows that Ms. Evans testified she understood the sequestration order, and she had not violated it. (Tr. 269). She admitted that petitioner was her brother-in-law, she was pretty close to him, and she would say anything to help him if she could. (Tr. 270-71).

C.      While cross-examining petitioner's brother, defense witness Jimmy Lee Evans, the prosecutor referred to petitioner's friends as drug addicts. (Tr. 287, 291). The record shows that Jimmy Evans testified he could not say whether petitioner's friends were addicts, because he did not know most of them. (Tr. 287). Jimmy Evans testified he had heard that petitioner used marijuana and had been addicted to Oxycontin, and Jimmy had made a previous statement that petitioner drank beer every day. (Tr. 282, 288). Petitioner himself admitted he had been in trouble for marijuana possession, he had been addicted to Oxycontin, and he drank beer. (Tr. 325, 327, 342). Petitioner also testified that Tina Wallace and Daniel Howard told him that Porter was selling fake methamphetamine. (328-30).

D.      During cross-examination the prosecutor caused petitioner to identity five gunshot wounds on a photograph of the victim. (Tr. 407-08). The record shows petitioner claimed on direct examination that he did not know how many times he shot Porter. (Tr. 355, 358). The photographic evidence, however, showed five bullet wounds. (Tr. 408).

E.      During cross-examination of petitioner, the prosecutor accused him and trial counsel of "crafting defense." The record shows the prosecutor said to petitioner on cross-

examination:

> So you've had all of this time to try to craft your testimony for today to try to come up with an explanation of how we can believe what Elizabeth Burton says and we can believe the Medical Examiner's report, but still we're going to have to weave in here a self-defense thing, right?

(Tr. 386).

Petitioner also complains that the prosecutor also allegedly accused defense witness Jerry Putnam of bias and commented on Putnam's threat to "bite [prosecutor's] lips off." (Tr. 386). The record shows Jerry Putman was actually a witness for the State, not a defense witness. (Tr. 177). Regarding the alleged comments by the prosecutor about Jerry Putman's threat to bite off the prosecutor's lips, those statements are not in the transcript at the cited pages. (Tr. 386). There was a discussion during Jerry Putman's re-direct examination about Porter's alleged threat to cut off petitioner's lips, but nothing about biting off the prosecutor's lips. (Tr. 194-96). Furthermore, there are no comments by the prosecutor at the cited trial transcript accusing Putman of bias. This court will not search the record for the supporting references and "generally will not consider factual allegations and arguments unsupported by citation to the record." *United States v. Snow*, 663 F.3d 1156, 1157 n.1 (10th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1615 (2012).

There is a portion in the prosecutor's cross-examination of petitioner, however, that reads as follows:

> Q: Well, wasn't that your mother that Jerry Putman hugged as he left the courtroom yesterday?
>
> A: I wasn't watching. I was out the other way.
>
> Q: Well, when Jerry Putman came up with this thing about he threatened to bite my lips off or something like that, didn't you give Jerry a thumbs-up over there?
>
> A: I said, thanks, Jerry, you know, for telling the truth.

(Tr. 391).

Further, the prosecutor allegedly made improper comments regarding petitioner's

appearance for trial (Tr. 392-393) and accused petitioner and his friends of being methamphetamine users. (Tr. 395). As discussed above in Ground V, the prosecutor noted that petitioner's appearance had changed in comparison to his booking photograph, saying petitioner looked "very nice in court today." (Tr. 392). Petitioner testified he had changed his appearance for court by shaving. (Tr. 392).

The record shows the prosecutor asked petitioner whether he was a methamphetamine user, and petitioner said he had used it in the past. (Tr. 395). The prosecutor also asked if petitioner had a lot of friends who used methamphetamine, but petitioner responded that he did not have very many friends. (Tr. 395). Petitioner also asked what the prosecutor meant by the term "friends." (Tr. 395). Petitioner then stated he "didn't notice anybody using methamphetamine when [he] was out there with Jerry [Putman]." (Tr. 396).

This court agrees with the respondent that the cross-examination of petitioner was entirely proper. The scope of cross-examination rests within sound discretion of the trial court, and the Court of Criminal Appeals will reverse only in cases of clear abuse of discretion that results in manifest prejudice. *Jackson v. City of Oklahoma*, 678 P.2d 725, 726 (Okla. Crim. App. 1984). "[A] trial court should allow cross-examination into matters which tend to explain, contradict, or discredit any testimony given by the witness or which tests his accuracy, memory, veracity or credibility. *King v. State*, 748 P.2d 531, 535 (Okla. Crim. App. 1988) (citing *Hall v. State*, 698 P.2d 33 (Okla. Crim. App. 1985)). Here, the court finds there was no abuse of discretion resulting in manifest prejudice, so appellate counsel was not ineffective in not raising these claims on appeal.

F.      During closing arguments the prosecutor (1) improperly bolstered and vouched for the credibility of the State's witnesses (Tr. 479, 480, 527), (2) improperly referred to petitioner's friends as "druggies" (Tr. 473), (3) improperly characterized the victim's death as a "senseless act" (Tr. 526), (4) made improper comments about petitioner's behavior and manner of testifying, characterizing at one point petitioner's testimony as a personal attack on the prosecutor (Tr. 474), and (5) accused defense witnesses of bias and untruthfulness (Tr.

481). This court did not find the alleged "druggies" comment at the citation given by petitioner, but finds the other statements made in closing were proper statements on the evidence from the State's position. Both the prosecution and the defense have the right to discuss the evidence fully from their respective standpoints, as well as the inferences and deductions arising therefrom. *Bland v. State*, 4 P.3d 702, 728 (Okla. Crim. App. 2000), *cert. denied*, 531 U.S. 1099 (2001); *Holt v. State*, 628 P.2d 1170, 1171 (Okla. Crim. App. 1981). Alleged prosecutorial misconduct does not warrant reversal, unless the cumulative effect of the conduct deprived petitioner of a fair trial. *Myers v. State*, 133 P.3d 312, 329-30 (Okla. Crim. App. 2006). Because that was not the case here, appellate counsel was not ineffective in presenting these claims.

### Ground XVI: Ineffective Assistance of Trial Counsel

Petitioner claims he was denied the effective assistance of trial counsel through counsel's numerous errors. Counsel allegedly failed to:

A. Independently test the suspected murder weapon for fingerprints, despite knowledge that petitioner's defense was that he had wrested the gun from the victim (Tr. 422-27, 434-37);

B. Recall State's witness Daniel Howard, despite reserving him as a witness (Tr. 134, 205);

C. Challenge the chain of custody of the gun (Tr. 219, 221, 224, 226-29, 233-235);

D. Object to prosecutor's causing petitioner to demonstrate the use of the gun to kill the victim (Tr. 370, 375, 379-84) (discussed in Ground IX);

E. Object to prosecutor's causing petitioner to identify five gunshot wounds on photos of the victim (Tr. 407-08) (discussed in Ground XV(D));

F. Object to State's witness John Miller's testimony that was outside his personal knowledge and area of expertise (Tr. 158-76, 168) (discussed in Grounds XIII and XIV);

G. Object to prosecutorial misconduct, as set forth in Ground XV;

H.      Prevent petitioner from standing trial and testifying while under the influence of Valium and Lortab, as set forth in Ground X.

Most of these ineffective assistance of counsel claims were found to be meritless in the previous grounds for habeas relief, so appellate counsel was not ineffective in failing to raise them on appeal. *See Parker*, 148 F.3d at 1221. As for the remaining claims, petitioner has completely failed to demonstrate he was prejudiced by trial counsel's failure to raise the claims at trial or by appellate counsel's failure to present the claims on direct appeal.

"To establish prejudice under *Strickland*, [petitioner] must show there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). Because there has been no showing of prejudice, Ground XVI fails.

### Ground XVII: Prosecutorial Misconduct Regarding Gunshot Wounds

Petitioner again raises the issue of his cross-examination about the number of gunshot wounds. He complains that the prosecutor's having him identify the five gunshot wounds in the morgue photograph of Porter denied him due process and a fair trial. The court, however, finds the examination was proper, because petitioner took the stand and was subject to cross-examination. Furthermore, he has failed to set forth any explanation of how this portion of the cross examination denied him due process or a fair trial. "Constitutional rights allegedly invaded, warranting an award of damages, must be specifically identified. Conclusory allegations will not suffice." *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981) (citing *Brice v. Day*, 604 F.2d 664 (10th Cir. 1979), *cert. denied*, 444 U.S. 1086 (1980)).

### Ground XVIII: Jury Instructions on Defense of Another and Resisting Criminal Attempt

Petitioner also alleges he was denied a fair trial and due process by the trial court's refusal to issue jury instructions for the defense of another and for resisting criminal attempt. After testimony for the first day was concluded, petitioner's counsel informed the court that

he had instructions for self defense, defense of others, manslaughter, and second degree manslaughter. (Tr. 211). The court responded:

> THE COURT: At this point I don't see any basis for self-defense or defense of a third person. The word "imminent" comes to mind. If you withdraw from a fray and you have a firearm and re-enter the fray, I think you lose that right. If that's the evidence and if it is as you say you're going to have show me some case law to support your position. You've said "justifiable" to the jury and I want to see what law satisfies that. . . .

(Tr. 211-12).

> MR. BUCK: I believe the facts are going to support it more than anything, Judge, because basically that's the reason I've been going into his inability to run and inability to get away and the size of the two people.

> THE COURT: All I'm telling you is from what I've heard to this point I don't see self-defense as a defense in the case. Please if you want to have some case law to support your position besides just the boilerplate stuff, I need to see it. You may have heat of passion and we can deal with that question, and defense of others. The word "imminent" comes to mind. None of those folks are around and I haven't seen anything that would indicate to me in this case that there was anybody present out there but him--

> THE WITNESS [sic]: Elizabeth Burton and her child.

> THE COURT: --and Mr. Porter.

> MR. BUCK: And her child.

> THE COURT: They were gone. When the shooting started they were gone. I want to see some law. We're in recess.

(Tr. 213-14).

Petitioner has not presented any arguments in this petition that support giving these instructions for defense of another. As the trial judge pointed out, Elizabeth Burton and her son had already driven past petitioner's truck when the shooting occurred. Regarding petitioner's requested instruction on resisting criminal attempt, this claim was denied on direct appeal, *Evans*, No. F-2007-424, slip op. at 3, and denied in Ground III of this petition. Because there was no basis for giving these requested jury instructions, and petitioner has failed to show he was denied a fair trial by the denial of the instructions, this ground for relief

also fails.  *See Maes*, 46 F. 3d 979 at 984.

### Ground XIX:  Jury Notebooks

Petitioner claims he was denied due process and a fair trial by the inadequate protections of Oklahoma's "jury notebooks" procedures.  He asserts the trial court failed to provide proper security of the jurors' notepads to prevent access to the notepads by persons other than the individual juror to which each notepad was assigned.

The record shows the trial court instructed the jurors on taking notes and admonished them not to share their notes with other jurors during presentation of the case.  (Tr. 96-97). When the court recessed, the jurors were told to write their names on the tablets and to leave the tablets face down in their seats for collection by the bailiff until they returned.  (Tr. 210, 318, 462). At the conclusion of the trial, the notes were either taken by the individual jurors or shredded by the court.  (Tr. 541).

The court finds petitioner has presented no facts indicating the notebooks were not secured or that an unauthorized person looked at the notebooks.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citing 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1995) (per curium)).  "Habeas corpus is a civil proceeding and the burden is upon the petitioner to show by a preponderance of the evidence that he is entitled to relief."  *Beeler v. Crouse*, 332 F.2d 783, 783 (10th Cir. 1964) (citing *Teague v. Looney*, 268 F.2d 506 (10th Cir. 1959)).  Here, the court finds petitioner's speculative claim regarding the juror notebooks does not support federal habeas relief, and appellate counsel was not ineffective in failing to present it to the OCCA.

### Ground XX:  Cross-Examination and Petitioner's Right to Remain Silent

Petitioner alleges the prosecutor's cross-examination improperly encroached on his Fifth Amendment right to remain silent, because there were inappropriate comments on petitioner's decision not to make a statement upon arrest.  On direct examination petitioner testified that after he shot Porter, he wanted to turn himself in.  (Tr. 360).  Instead, he got the

body out of the truck and returned to Jerry Putman's house to wash himself and the truck. (Tr. 361). He did not tell anyone what had happened, because he did not want anyone to be "involved." (Tr. 361). When the police arrived, petitioner made statements to them, voluntarily saying, "I had to do what I had to do." (Tr. 363). Petitioner admitted the officer did not ask any questions, but denied the officer's testimony that petitioner voluntarily spoke about "messing with the grower" and that he used the work "whack." (Tr. 363-64).

The prosecutor continued with this line of questioning:

Q: Then you go up to Jerry Porter's (sic) house--sorry Jerry Putman's house?

A: Putman's. . . .

Q: Then you're on your way to turn yourself in?

A: Yes. Well, I was going to go over to Lee's house and give him back the truck and say, what do I do now?

Q: Did you turn yourself in to Bob Parker when he stopped you?

A: Pretty much.

Q: Did you say, I killed Calvin Porter?

A: No.

Q: Did you turn yourself in to Darian Galloway whenever he came out there?

A: I'm not supposed to say anything without an attorney present. They did give me my Miranda warning.

Q: Well, you just told us all you wanted to go turn yourself in.

A: I was going to get an attorney first before I did it.

Q: Well, you've had an attorney now, haven't you?

A: Yes.

Q: And you're talking now, aren't you?

A: Yes. I knew it wasn't going to look too good.

Q: Thank you.

MR. BUCK:  Object.  Judge, may we approach?

THE COURT:  Yes.

(The following proceedings were had at the bench outside the hearing of the jury.)

THE COURT:  I'm listening.

MR. BUCK:  Judge, we're getting dangerously close here to impeding on his right to remain silent back then.

THE COURT:  You can't comment on it.

MR. BUCK:  Excuse me?

THE COURT:  He can't comment on it.

MR. BUCK:  So--

THE COURT:  Your guy was the one that said he was going to turn himself in.  Mr. Brown was able to follow that up, but he can't ask him about why he didn't make a statement or did you make a statement or questions of that sort. I agree he's getting close.

MR. BUCK:  I believe that--I would like to object to the line of questions that have already been asked and have an exception to all of those questions.

THE COURT:  You can have an exception to it, but it was proper the line of questions that were asked.  He was close, but I don't think he crossed the line.

MR. BUCK:  Thank you.

(Tr. 388-90).

In *Robinson v. State*, 743 P.2d 1088 (Okla. Crim. App. 1987), the OCCA held that a police officer's testimony was not an improper comment on the defendant's right to remain silent, because the defendant had "volunteered the information before receiving *Miranda* warning and thus had not been induced to remain silent."  *Id.* at 1092.  Here, the court finds the cross-examination was proper and relevant to petitioner's claim that he acted in self-defense and wanted to turn himself in.  The prosecutor's questions followed petitioner's opening the door with his statement that he wanted to surrender and showed that petitioner's actions were contrary to his stated intentions.  The record shows that trial counsel voiced an

objection and the cross-examination on this subject ceased. This court further finds the OCCA would not have granted relief on this claim, and appellate counsel was not ineffective in not including this claim in petitioner's appeal.

### Ground XXI: Ineffective Assistance of Appellate Counsel

As thoroughly discussed above, none of petitioner's claims raised in Grounds IX through XX are meritorious. Therefore, appellate counsel was not ineffective in failing to raise the issues on direct appeal, and petitioner has not shown "cause" for not properly presenting the claims to the state courts. Grounds IX through XX are procedurally barred.

The court further finds that petitioner has failed to demonstrate that application of the procedural bar will result in a fundamental miscarriage of justice. The Tenth Circuit Court of Appeals has held that "[c]ases involving a fundamental miscarriage of justice 'are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.'" *Gilbert v. Scott*, 941 F.2d 1065, 1068 n.2 (10th Cir. 1991) (citing *McClesky v. Zant*, 499 U.S. 467, 494 (1991)). The Tenth Circuit has explained this "very narrow exception" as follows:

> [T]he petitioner must supplement his habeas claim with a colorable showing of factual innocence. Such a showing does not in itself entitle the petitioner to relief but instead serves as a "gateway" that then entitles the petitioner to consideration of the merits of his claims. In this context, factual innocence means that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."

*Demarest v. Price*, 130 F.3d 922, 941-942 (10th Cir. 1997) (internal quotations omitted). Because petitioner has not made a colorable showing of factual innocence, relief cannot be granted. *See Herrera v. Collins*, 506 U.S. 390, 404 (1993); *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986).

**ACCORDINGLY**, the Magistrate Judge recommends that this action be, in all respects, dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given fourteen (14) days from being served with a copy of this Report and Recommendation to file with the Clerk of the

Court any objections with supporting briefs.  Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions.  *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this 1st day of August, 2013.

**KIMBERLY  E. WEST**
**UNITED STATES MAGISTRATE JUDGE**